# Wood *et al. v.* The American Life Insurance and Trust Company.

The certificate of a notary public of demand, protest and notices, verified by oath, according to the statute, is not conclusive; but it may be impeached by proof of particular or general acts of mal-practice in office, and in making up his records.

The notarial certificate of facts is of no higher weight than the declarations of the notary would be were he examined as a witness.

It seems that a justice of the peace may explain under what circumstances he certified a notarial certificate, although the effect of his testimony may be to destroy the credit of the certificate.

When it appeared, from a notarial certificate, that the notary resided in the county where the trial was had, and the introduction was objected to generally, and not on that particular ground, it was held that its admission in evidence was error.

When there were two trials in a cause, and on the first trial there was a verdict for the defendant, but on the second a verdict for the plaintiffs, and the case brought up under the statute on exceptions to the granting of the new trial, the court for the correction of errors finding the first verdict on legal and sufficient evidence, and the last contrary to law and evidence, pronounced judgment on the first verdict, according to the finding of the jury.

The general credit of a witness cannot be attacked by particular inquiries; but, when particular credit is concerned, particular inquiries are proper.

IN ERROR from the circuit court of the county of Adams.

This was an action of assumpsit, by defendants in error, in the circuit court of Adams county, against Wood, Penticost & Co. Alonzo Wattles and Noah Barlow, on the note of Wood, Penticost & Co. indorsed by Wattles & Bennett and Noah Barlow, for six thousand nine hundred and seventy dollars, dated August 1, 1837, payable three months after date. Plea, general issue— which, before trial, was withdrawn as to the drawers of the note, and a judgment against them by default; and the issue between Wattles and Barlow, the indorsers, and the plaintiffs below, was

Vol. VII.—52

tried first at the May term, 1841, and again at the November term, 1841, of the circuit court.

Upon the first trial there was a verdict and judgment for Wattles and Barlow, and thereupon a motion made by plaintiffs below for a new trial, on the grounds—

1. That the verdict is contrary to law and evidence.

2. That court erred in admitting the record in the case to be impeached by particular facts that transpired in other cases.

3. That the court erred in admitting blank affidavits, in no way connected with the case.

And the court granted the motion; to which Wattles and Barlow excepted, and filed a bill of exceptions, embodying all the testimony, and upon the trial of the cause, under the statute in such case made and provided; the substance of which was, the note sued on, as read by counsel for plaintiffs below; then a record, purporting to be a record of the protest of the note, after the objection of Barlow and Wattles to the same being overruled, and notice to the indorsers, setting out that James K. Cook, as justice of the peace and notary public, went to the banking house of the Commercial Bank, Natchez, on the 4th November, 1837, and presented the note for payment, demanded payment, was refused, and protested it. After the protest followed a copy of the note, with its indorsements; then a statement signed Jas. K. Cook, J. P. "all notices, this 6th November, 1837, for residents in the city of Natchez, delivered by me to the individuals, or at their respective dwellings or places of business, by 10 o'clock A. M., and all notices out of the city put in the post office in time for the mail succeeding protest; thus, notice to Wattles & Bennett, Natchez, at their store, to Noah Barlow at his store." And also the following statement: "Notices of the protest of the within protested note served as follows: to Wattles & Bennett at their store; to Noah Barlow at his store; the 4th November, 1837. (Signed) Jas. K. Cook, J. P." Then follows, in the record, a separate piece of paper, attached to the notarial record by wafers, as follows:

"I, James K. Cook, justice of the peace and ex officio notary public, in and for the county of Adams, in the state of Mississippi, do hereby certify that the foregoing is a full, true and perfect

record of what I have done in relation to the foregoing protested note, $6970.24, therein mentioned and set forth.

JAS. K. COOK, J. P."

"The State of Mississippi, Adams county, ss.

"Personally appeared before the undersigned, justice of the peace in and for the county aforesaid, James K. Cook, justice of the peace and ex officio notary public, whose name is signed to the foregoing certificate, who, being duly sworn, saith on oath that the said certificate is true in substance and in fact.

"Sworn to and subscribed this 29th day of October, 1839.

L. ROBETAILLE, J. P."

It was admitted that the note was in bank during banking hours, and that the 5th was Sunday; which was all the testimony of plaintiffs below.

Wattles and Barlow then introduced Samuel Wood, clerk of the court, and, upon being sworn and called upon to examine said notarial record, stated that the words "at their store, to Noah Barlow at his store," in said record, were in a different hand-writing from the previous part, and written with different ink and with a different pen; the words quoted being in Cook's hand-writing, and the entry indorsed on the protest of notices on the 4th November, 1837, was in Cook's hand-writing.

Barlow and Wattles then introduced Louis Robetaille, a justice of the peace, before whom the affidavit purported to be made, who being sworn, testified his signature was to it; that Cook's signature is his, and date in his hand-writing; that the way such affidavits were prepared and records completed, was—sheets of the affidavits were printed in blank, and then brought by Cook to witness, Robetaille, who at his leisure dated them and signed his name. Some month or two afterwards, Cook and Robetaille went over the volumes together, previous to which Cook, at his leisure, added his signature, but not in witness' presence. Witness and Cook then compared the affidavits with the protests, and then attached them to the leaf containing the protest, with wafers, Cook sometimes wafering, and witness several times, at different places through a volume of said protests; and then witness administered to Cook one general oath to the volume, or the affidavits

contained in it, without any reference to each particular affidavit; and that Cook was not sworn to the affidavits otherwise than the general oath, except in particular cases, where certificates were wanted by a particular person, which was furnished him and not embraced in the book. The affidavits, thus purporting to be sworn to, were sometimes in the possession of Cook, sometimes of witness, before used.

Counsel of Barlow and Wattles then exhibited to witness some ten or more of those blank affidavits, which were spread upon the record, the signatures to which by Cook and himself were proved by him, and they were the same as the one read in evidence by plaintiffs below, except the date was different, and the amount left blank. On cross-examination, witness stated that the writing on the back of the leaf, of notices on the 4th of November, signed by Cook, and above where the piece of paper containing the statement and affidavit was wafered on, was in Cook's hand-writing.

Mr. Potter testified on part of Wattles and Barlow, that the blank affidavits read in evidence to the jury by counsel on examining Robetaille, were found loose in a volume of protests, or on the floor, in the court house, in Natchez, in November, 1840.

Aylet Buckner, Esq. a witness, by Wattles and Barlow, to impeach the said notarial statement of said Cook, testified that on presenting a note of upwards of fifty thousand dollars to Cook, protested by him, to ascertain as to his notices to one Stephen Terry, he said he had sent the notice to Port Gibson; upon inquiry of Mr. Fiske, when told it was insufficient, he then stated that he sent the notice to Rodney. He was afterwards told, upon examination by Buckner, that Fayette was the place for the notice, and that he, Cook, was liable for the amount, and thereupon Cook stated he would or could furnish a notice for Fayette, or would testify to that fact. This testimony was objected to.

J. H. Van Hosen, Esq. testified that he held a protest of Cook's, purporting to make demand at the Bank of Natchez, the note being payable at the Planters' Bank of the State of Mississippi. He showed it to Cook, knowing that it was defective, and Cook proposed to insert the name of the bank in the note, stating he knew it was correct. The note was due in 1837, and witness saw him about it about six months before witness testified at May term, 1841.

Witness objected, and Cook said he thought he had a right to change his records in any case. And on Cook being asked if it was correct in the volume of protests, he said he did not know, without examining first. This testimony objected to.

Rebutting testimony by plaintiffs below:

William C. Conner knew Cook thirty or thirty-five years; knew his character for truth and veracity, and would believe him on oath.

J. S. B. Thatcher stated that he knew Cook's character for truth and veracity; considered him a most exemplary man, and related an instance of it: that Cook made an alteration or addition to his record, upon the application of witness, from a memorandum or slip of paper Cook had on a file of papers of some kind, but refused to add any thing further than from the memoranda. Witness stated that the note had been protested eighteen months before Cook made the change, and since last term of the court, at which a good deal was said about the looseness of his records.

Dr. John Ker testified that Cook was a man of truth and veracity; had known him for twenty years.

Aylet Buckner testified that he knew nothing against Cook's general character; that his records were loosely kept.

B. O. Smith, one of the jury, knew Cook from boyhood; knew nothing against his character for truth and veracity.

Connolly testified that the records were made up in the bank, filled up generally by a clerk; sometimes memorandum of notices added after other parts made out, but generally added by the same clerk, but when he was absent Cook did it himself.

The cause came on for second trial at November term, 1841, and bill of exceptions taken by Wattles and Barlow, embodying the evidence upon the second trial, and points reserved by them.

The note sued on was offered in evidence by plaintiffs below; objected to on ground that on its face it was signed by Wood, Pentecost & Co. by Robert W. Wood, in liquidation, and no authority to show Wood's power thus to sign. Objection overruled, and point reserved.

Plaintiffs below then offered in evidence what purported to be a notarial record of protest and notices thereof, being the same read upon the first trial of the cause, to the admission of which

52*

Wattles and Barlow objected, on the ground of its incompetence generally, and also that it appeared on the face of it that the words, "at their store, Noah Barlow at his store," were in different pen, ink, and hand writing; and that on the face of the protest notices purport to have been given on the 4th of November, and on the back on the 6th November, 1837. It was admitted by counsel of Wattles and Barlow that the 5th was Sunday. But court overruled the objection, and the same was read. Point reserved.

Plaintiffs below then introduced witness, Geo. Connelly, as to Cook's habits in making up his records, and upon cross examination witness stated that in his opinion the words, "at their store, Noah Barlow at his store," were added after the making up of the record, but could not say how long subsequent. Witness was asked by counsel of Wattles and Barlow, "whether said Cook was or was not in the habit of altering said notarial records after he had made them up?" which question was objected to by plaintiffs below. Objection sustained, and point reserved.

Plaintiffs below here closing their testimony, defendants below, Barlow and Wattles, offered Louis Robetaille as a witness, to impeach said notarial records, and to show they were not made up as the law requires, and offered to prove by him what he had proved upon the former trial of the cause, in connection with the same blank affidavits; but plaintiffs below objected to the testimony. Objection sustained, testimony excluded, and point reserved.

Barlow and Wattles then offered to prove by George Potter, Aylet Buckner, and J. H. Van Hosen, Esquires, the same that they had proved upon the former trial; but objected to by plaintiffs below, evidence excluded, point reserved.

Defendants then asked court to instruct jury that the fact stated in the record, that the notary left notice at the store of Wattles & Bennett, is not competent evidence that they had a store, nor that the notary gave such notice as would charge the indorsers; which instruction the court refused to give, and exception taken.

Jury then found a verdict against Barlow and Wattles for nine thousand two hundred and fifty-five dollars, eighty-five cents. Judgment thereon in the court below.

QUITMAN & McMURRAN for plaintiff in error.

We rely confidently on maintaining the position before this court, that the court below erred in granting to the plaintiffs in that court a new trial upon the first verdict of the jury in favor of the defendants below: Consequently that this court will reverse the decision of the circuit court in awarding the new trial, and render judgment for Barlow and Wattles on the verdict of the jury in their favor. See Act of 1830, Rev. Stat. 314.

The court will bear in mind that a judgment by default had been taken against the makers of the note sued on, and that the issue tried was confined to the plaintiff below, and the indorsers Barlow and Wattles, and that the latter are the parties really interested in this case. The grounds upon which the plaintiffs below predicated their motion for a new trial were: 1. That the verdict was contrary to law and evidence. 2. That the court erred in permitting Cook's notarial record to be impeached by particular facts, transpiring in other cases: and 3. That the court erred in admitting blank affidavits in no way connected with the case.

In the first place, then, we contend that the verdict of the jury upon the first trial, which we are examining now, was not contrary to either law or evidence, but on the contrary corresponded with the law and evidence in the case.

The plaintiffs below introduced a volume, purporting to be notarial records of one James K. Cook, and after the objection of the counsel of Barlow and Wattles to its competency as evidence was overruled, the plaintiffs' counsel read from the volume what purported to be Cook's protest of the note sued on, and two separate statements of notices to Barlow and Wattles & Bennet, one statement showing that the notices were given on the 6th and the other on the 4th of November, 1837, together with what purported to be Cook's affidavit on a separate piece of paper attached by wafers, and purporting to be sworn to on the 29th of October, 1839. Upon this testimony the plaintiffs rested the case in the first instance, and the counsel of Barlow undertook to impeach and destroy it.

The only testimony offered to rebut all this impeaching testimony was of a general nature, as to Cook's character for truth and veracity, and that the witnesses would believe him on oath. But not one question by plaintiffs below, as to Cook's records, habits or

conduct as notary, or whether they ought to be credited by a jury. No, the opposite counsel dare not venture at all into the subject matter of our attack and impeachment of Cook's notarial records and notarial conduct, if we may be allowed the expression. Why, even the testimony of one of their witnesses, Judge Thatcher, upon cross examination, is sufficient of itself to impeach these notarial manufactured statements of Cook, and sustain the verdict of the jury in favor of Barlow and Wattles. Judge Thatcher considered Cook as an exemplary man, and as an instance relates that Cook made an addition or alteration to his record upon application of the witness from a memorandum or slip of paper Cook had, but refused to add any thing further than from the memorandum, and seemed to be excited at the idea of such a request, made however after these notarial doings had made some stir, and this addition or alteration for Judge Thatcher was made some eighteen months after the protest of the note.

Can any man who reads the testimony doubt that the jury found correctly; that the weight of evidence, or rather the whole evidence, was in the favor of the verdict? Assuredly not. The judge below who granted the new trial could not doubt this, but he doubted the competency of the testimony introduced to impeach; which we will presently consider. And on this point we will barely add, that the testimony in this case was peculiarly within the province of the jury; in weighing it there was no question of law at all involved, and in such a case the court will never grant a new trial. Every reason and principle applicable to the doctrine of new trials, are opposed to the granting of it in this case. And we will refer to an authority or two which we consider decisive. Graham on New Trials, 362, 376-78-80-89; 3 John. Rep. 271; 3 Wils. 45.

A record is a statement put down at the time, and can in no case be altered, except by some particular legislative or competent authority. Even this court, or any other in the state, cannot alter its records for mistakes and misrecitals, except by a legislative provision, and in particular cases. See Rev. Code, 125, sec. 96. And if a clerk of a court makes a false entry, razes a single letter, or changes a record in his keeping in any particular, he is subject to fine and imprisonment. How. & Hutch. Dig. 484, sec.

19.   And it is absurd, worse than absurd, to say that a notary can complete, add to, or alter his records, whenever he chooses. In the case of Elliot *et al. v.* Piersal *et al.* 1 Peters, 328–341, we have an authority very much in point.

But it may be urged by the opposite counsel, that an oath to the record offered by them and read in evidence, was unnecessary; that their proof was sufficient without it, under the first section of the act of 13th May, 1837.   Rev. Stat. 762–63.   But this ground is at war with their own conduct; they read in evidence the affidavit as annexed to the protest, and made it a part of their proof, and therefore cannot now avoid it.   But suppose the affidavit be not necessary, then the statement of the notary is open to impeachment in the same manner, and the proof used, and our arguments, apply just as forcibly to the certificate without the oath, as with it.   But again: this statement is not under his seal of office; there is no official seal to it, nor evidence of any private seal. Besides, it was not a certificate on the record, but a detached statement with the oath on a separate piece of paper, and never designed or used as a certificate under the act of 1837; and assuredly it cannot be seriously contended that it can now, *in extremis*, be palmed off as competent without any affidavit.   Moreover, it was used to establish notice to the indorsers.   Now, this giving of notice is not an official act of the notary or justice, as provided for in the act of 1837.   The notifying of the indorser may be done by any third person, by the holder himself, and the notary in doing it is acting merely as the agent of the holder of the note or bill; and because it is done by a notary or justice, it is not on that account an official act: it is no part of his official duty.   4 How. Rep. 98, 104, Barnard *v.* Planters' Bank; 2 John. Rep. 204.

But furthermore, this certificate, even if an official act, could be used only where the notary resided out of the county where the testimony was to be used.   It was to dispense with compelling the notary or justice to attend court out of the county of his residence, and has no application to a case where the notary resides in the county.   The first and second sections of the act of 1837, already cited, show this.   We have no doubt that the act of 1833 is subject to the same construction; and such is the opinion of this court in the case just cited.   Now the record in this

case shows on its face that Cook resided in Natchez; it is so stated
in the protest, and so appears.   So that in every aspect of the case
we are brought to the same conclusion, that the law and testi-
mony were with the indorsers, and the verdict of the jury accord-
ingly.

But we will now examine the other ground for a new trial, and
that is, that the court erred in admitting Cook's notarial record to
be impeached by particular facts that transpired in other cases;
and in admitting blank affidavits in no way connected with the
case.

We confess that we are at a loss to discover any other way in
which the record of Cook could be impeached, but in the mode
pursued by us.   Admitting that these notarial records are admis-
sible as evidence, and what are their nature and character?   Are
they too high to be impeached, too sacred to be contradicted?
Surely they are neither the judgments or decrees of courts.   They
are nothing but the memoranda of an officer of what he did
touching particular transactions; and being an officer selected for
the business, the law supposes he will do his duty correctly, and
make a true statement of what he does.   It is not conclusive; it
is *prima facie* presumed to be correct, but open to attack and im-
peachment.   This court gave the true character of this kind of
proof in its opinion in the case of Barnard *v.* The Planters' Bank,
already cited, when it says: "the difference of the rule thus crea-
ted by the statute, from that of the common law, is, that the re-
cord is (conclusive) evidence in the lifetime of the notary, under
the statute; whereas it is only evidence after his death by the
common law."   And this is the only sensible ground on which it
can be placed, or contended that the legislature intended to place
such documents.   What rule of law, then, comes in conflict with
the evidence offered by the plaintiffs in error to impeach Cook's
record?   To show that his habits were bad, that he kept his re-
cords loosely; to show that the affidavit was untrue, and wholly
false; to show that the same kind of affidavits, signed and ready
to be attached to any protest by adding the amount of the note,
were scattered loosely in the court-house, and susceptible of being
successfully used by any one; to show that a part of the record
was made out in a different hand, with different pen and ink; to

show that Cook knew nothing of his duties, or was utterly regardless of them and his oath; that he was ready to supply certificates to any extent desired by counsel, and ready to alter his records at any length of time after the protest: surely, surely, to show this was competent, was proper to be submitted to the jury, for them to determine what faith and credit were due to his certificate and oath in this case. It was directly attacking his conduct and habits touching the business contained in his record, and it was legal and competent to do so.

The Supreme Court of the United States, in the case of Nicholls *v.* Webb, 8 Wheat. Rep. 326, recognizes this position to the fullest extent.

In the case just referred to, the deposition of Sophia Perkins, the daughter of the deceased notary, being offered in evidence, was objected to, but admitted, and its admission sanctioned by the supreme court. Now, what was her proof? That her father kept a regular record of his notarial acts, and uniformly entered, or caused them to be entered, into a book kept for that purpose, &c.

The provision of the act of 1833, under which the notarial proof was introduced, is decisive of this point. It provides that the proof shall have the same effect as if the notary were present in court, testifying in person. Suppose, then, Cook had appeared in person and testified that his record contained a complete statement of what he did; that he had no recollection of the particular facts, but that he doubted not that his memoranda were correct, who could doubt that the proof, offered by the counsel of Wattles and Barlow to impugn this proof, would have been competent?

We are examining the competency of proof to impugn his notarial acts—his conduct as a notary; and we insist this can be done in the mode we did it, just as it would have been competent to show that he had made a different statement from his record; that he had said his records were generally false and unworthy of belief; that he was in the habit of making them out years after they purported to be made out; and that they were made out just as a party or attorney wanted them made out, or just as we could destroy the testimony of a witness by showing that he had sworn

Wood *et al. v.* The American Life Insurance and Trust Company.

differently on a different occasion. 2 Phil. on Ev. 396, 397, 766, 767; 3 ibid. 1084, 1085; 19 John. R. 115, 122; 3 Phil. Ev. 1089, irregular return set aside.

Again: the date to the affidavit of the 29th of October, 1839, shows that it was made two years after the transaction, and therefore for this reason it was inadmissible. And the notices were nullities, as set forth in the record. It simply states that notices of protest were served, and as this is a "true, full and perfect record," we must believe that the notices contained nothing more than that. the note was protested. No notice that the note had been presented for payment at the proper time and place, that payment had been refused, and that the holder looked to the indorser for payment. No, nothing of this, and still this was requisite to make the notice good.

It is in fact no record at all, and it is competent for that to be shown at any time. 1 Pickering's Rep. 362.

But again: there was no law at the time of the trial of this cause, nor at this time, authorizing such a document, emanating from a "justice of the peace and *ex officio* notary public," to be read in evidence in a court of justice, to fix the liability of an indorser of a note or bill. This will require a brief examination of the legislation of our state upon this subject, commencing with the act of 1833, referred to already. For we believe there is nothing prior to that time, pretended to apply to this question.

With regard then to the act of 27th February, 1833, Rev. Stat. 456, admitting for a moment that that act is still in force, it does not extend in its provisions to the certificates of justices of the peace. It is confined exclusively to the acts of notaries public; and it would just be as competent to introduce the *ex parte* affidavits of a judge, a clerk, or any other officer, as evidence, as to introduce the affidavit or certificate of a justice of the peace. Cook was acting as justice of the peace in this case, and when he acts as notary by virtue of his official character of justice, he is in law a justice of the peace, and the law exempting the notary public from personal attendance in court does not extend to the former.

But it is said that the act of 26th of February, 1836, Rev. Stat. 577, authorizes the certificates of the justice, acting as notary, to be read in evidence. That act provides in its first section: "That

all the powers theretofore belonging to notaries public shall *ex officio* be, and vest in justices of the peace of the respective counties of the state." This is simply an act to extend the powers of justices of the peace; to confer on them the authority to do the acts usually done by a notary ; but it does not make their certificates or *ex parte* affidavits proof of what they may do. The act of 1833 was passed to amend an act entitled "an act to regulate the taking of documentary testimony in certain cases, and for other purposes, approved the 13th of December, 1830." Now the act of 1830, and this act of 1833, amendatory thereto, concern solely the taking of proofs; it does not concern nor extend the powers of printers in one case, or notaries in the other. It merely adopts a new mode of proof, at war with the ordinary rules of evidence, and will not be extended by this court by implication. We repeat then, that the act of 1836, does nothing more than confer on justices of the peace the powers of a notary, and leaves the proof of his acts open to the ordinary rules of evidence. The second section of this last mentioned act must be conclusive. It provides that all.acts which may be done by justices of the peace of a notarial character shall receive the same credit and legal import, as are attached to the acts of notaries public, in the United States. It places these justices in regard to notarial acts on the same footing with notaries generally throughout the United States ; and the doctrine is too well settled that the acts of notaries public are not evidence to prove notice. It is no official act, the proof of notice made by them must be the same as that by any other person, by deposition or examination in open court. We will barely refer to the authorities already cited on this point. Barnard *v.* Planters' Bank, 4 How. 98; 2 John. Rep. 204.

And, to remove every possibility of doubt, the 6th section of the act of 1836 expressly repeals all acts and parts of acts coming within its meaning or purview. This act also provides that the justice may authenticate all his acts, instruments and attestations by his common seal of office. But it will not be pretended that this makes his memorandum of notice to an indorser evidence of itself. And it must be authenticated by his "common seal of office." Now, in the case before the court, there is no official

622 HIGH COURT OF [*January*

Wood *et al. v.* The American Life Insurance and Trust Company.

seal, nor any seal at all. There is nothing but the signature of Cook. Walker's Rep.

The next error which we will notice, in our assignment of errors, is that growing out of the question we propounded to Geo. Connelly: "whether said Cook was or was not in the habit of altering his records?" Connelly was introduced as a witness to show how Cook made up his records; he had acted as his clerk in these notarial doings of Capt. Cook, and was familiar with Cook's habits. He was asked, upon cross-examination, his opinion as to the words we contend had been subsequently added, to wit: "at their store, Noah Barlow at his store;" and, in his opinion, they were added *after* the making up of the record, but how long he could not say. He was then asked the question mentioned, and, being objected to, the court decided the question incompetent. Now, we cannot conceive a more pertinent and legitimate inquiry. How and what were Cook's habits in making up his records, had been inquired into by the opposite counsel, and on what ground can it be decided that it was not competent to prove that Cook was in the habit of altering his records generally, *ad libitum*, and consequently that they were not to be accredited by the jury? Surely such proof, in the language of Judge Story, would be encountering Cook's records "with facts and presumptions which diminish its credibility or certainty."

Again: we insist that the court below manifestly erred in excluding the testimony offered by Wattles and Barlow to impeach Cook's notarial record. We offered to prove, by Robetaille, that these records were not made up according to law; that the affidavit to them was untrue and false in every essential; and by Buckner and other witnesses, the same testimony detailed by them on the former trial, and spread upon the record. We have shown, we trust, that such testimony was legitimate and amply sufficient for the purpose of impeachment. And we will not here rehearse our argument. These records could be impeached in no other way; and the only ground on which such evidence could be excluded would be, that records, as manufactured by Capt. Cook, and perfected by him and Robetaille, are too sacred, too holy, to be impeached. But we have no apprehension of such a decision

Wood *et al. v.* The American Life Insurance and Trust Company.

of this court; and, having no such apprehensions, satisfied that this testimony was properly admitted upon the first trial, and improperly excluded on the second trial, we therefore repeat, in conclusion, that we confidently rely upon this court reversing the decision of the court below granting a new trial, and rendering a judgment in favor of Barlow and Wattles on the first verdict of the jury, as that court ought to have done upon every principle.

McDannold & Mathewson for defendants.

The principal objection urged by the plaintiffs in error against the decision of the court below is, the permission given to the plaintiffs below to read in evidence the notarial certificate of Jas. K. Cook, and in overruling the objections of the counsel for defendants to the admission of the same. The statute of 1837, (How. & Hutch. 611, Revised Laws of Mississippi; see also the statute of 1833, How. & Hutch.) providing for the taking of documentary evidence, makes the official act of a notary public, certified under his hand and attested by his seal of office, as competent and conclusive evidence in any court of law or equity in this state, as if the same were given personally by such notary public. See 4 How. 179. We contend that this statute sustains the decision of the court below. The record in this case was in perfect accordance with the requisitions of the statute, for it purported to be the official act of James K. Cook, certified under his hand and attested by his seal of office. It stated upon its face that the note was presented on the proper day and at the proper place for payment, and payment was refused, and the correct disposition of the notices to the indorsers, both with regard to time and place. The statute had made such an official act as competent and conclusive testimony as if the same was given personally by the notary public, and the court below was bound to admit it in the absence of that officer. If, then, the court below was right in permitting the record to be read in evidence by the plaintiffs below, then there was no error in granting a new trial when the verdict of the jury was certainly contrary to the evidence of the notary, or in admitting the same official act of the notary to be read as evidence upon the second trial of this cause.

The next point for consideration is, whether the court below erred in sustaining the objection made by plaintiffs' counsel to the question propounded by defendant's counsel to Mr. Connelly, viz: "whether Cook was in the habit of altering his records?" The first thing which appeared to excite the suspicion of the defendant's counsel below, was the fact that the record offered in evidence appeared to be made up in the hand writing of two different persons. The part of the record, however, which stated the disposition of the notice, was proven to be in the hand writing of the notary. Connelly proved that Cook had a clerk in the different banks, who generally filled up the records, leaving a blank for the statement of the manner in which the notices to the indorsers were delivered; and that sometimes Cook, and sometimes the clerk for him, filled up the blank. It is not necessary that the record should be made up in the hand writing of the notary; for any one, whom he thinks proper to employ, can do it with propriety; and though it were made up in the hand writing of a dozen different persons, yet if the notary sign it, and certify under his hand and seal of office that it is his official act, it is all that the statute requires.

The decision of this court in the case of Barnard *v.* Planters' Bank, 4 How. 98, is directly in point. Here there was a record made up according to all the requisitions of the statute, and permitted as such by the court below to go to the jury. Was the question, then, propounded to Connelly, a legal one? We think not. It has been repeatedly decided, that the memoranda of a deceased notary is admissible evidence to the demand of the payment of a note and the notice to the indorsers. The case of Nichols *v.* Webb, 8 Wheaton, 326, is perhaps the strongest in point. In that case the only evidence was the protest and the deposition of the daughter of the notary, who stated the entries made concerning the note sued on in the notarial records of her father. The memorandum of the notary was, "that he had duly notified the indorsers." To this he had affixed his signature. This evidence was considered admissible by the Supreme Court of the United States, as being the best that the nature of the case admitted of. But it was admitted upon the principle which had been well established by repeated decisions: "that memoranda

made by a person in the ordinary course of business, of acts which his duty in such business requires him to do, are, in case of his death, admissible evidence of the acts so done." When testimony such as this is all that can be produced, the court regarding it, although the best that could be procured, yet of a secondary and inferior character, would perhaps admit evidence to discredit those memoranda, and let the jury decide upon the weight of the testimony offered.

But the case now before the court is, in our opinion, of an entirely different character, and must be decided upon entirely different principles. It is not the loose and disconnected memoranda of a deceased notary which was offered in and admitted by the court below, but the entire and complete record of a sworn officer, certified under his hand and attested by his seal of office, as his official act, offered in the life time of that officer, and as such, and under such circumstances, made as competent and conclusive testimony as if the contents were delivered personally, by a statute law of the state of Mississippi. It certainly then could not be attacked in the manner in which the loose memoranda of a dead man, and offered unsworn to and uncertified, must necessarily from its inferior character be liable to.

The court below could not place such a piece of documentary evidence as the record in this case upon an equality with evidence which courts have always regarded with a jealous eye, and liable to be combatted from the very weakness and uncertainty of its character. The statute had made such evidence as was offered in the court below equal in competency and weight as the best which can be produced—the personal testimony of a witness. It gives the notary, as a sworn officer, the privilege of giving his official act in evidence, instead of being compelled to attend personally and give his evidence in every case which might require it. And the record in this case was given to the jury clothed with all the solemnity and importance with which the law dignifies the records of its courts; and it is one of the best established principles of the law of evidence, that no collateral proof is admissible to impeach the authority and accuracy of a record. 2 Starkie on Evidence, 705.

After the record of the notary in this case was permitted to go

53*

to the jury as a record, the only question which could possibly be raised to injure its effect, was, the question of record or no record. It was received as the act of a sworn officer, and no evidence as to his habits in other similar matters, or of the depravity of his character, could possibly affect that particular act. See 4 Cranch, 421, or 2 Cond. Rep. 157; 3 Marshall, 393.

The protests of a foreign bill of exchange are admissible in evidence to prove a demand upon a drawer, they are regarded as the official acts of a sworn officer; and where such a document is offered in evidence to prove that a demand had been made upon the drawer, would it be permitted by any court that such an official act of a sworn officer should be attacked in the manner in which defendant's counsel below wished to attack the record in this case? Certainly not. It stands as the official act of such sworn officer, made in the upright and honest discharge of his duties; as such the law throws over it its mantle of protection, and regards it with the most especial favor. The sheriff is a sworn officer, and would any court permit his return to be disputed, either directly or indirectly? The principles of law which govern in the case of a protest of a foreign bill of exchange, or the return of a sheriff, are the same, and must govern in the case before the court.

If these premises be correct, then the conclusion inevitably follows, that the court below was right in not only sustaining the objections made by plaintiffs' counsel below to the question put to Connelly by defendants' counsel, "whether Cook was in the habit of altering his records," but also in refusing to admit the testimony of L. Robetaille, Esquire, and others, to endeavor to impeach the records of the notary, as mentioned in the record of the case and the fifth assignment of error; and consequently right in sustaining the motion made by plaintiffs' counsel for a new trial after the first trial of this cause.

With regard to the sixth assignment of error, imputing error in the court below refusing to give the instruction asked by defendants' counsel, we have only to say, that if the record was evidence at all, it was evidence in every respect of the facts contained in it. The notary states that he delivered to "Wattles and Bennett, Natchez, at their store, Noah Barlow at his store," and certainly

was evidence that they had stores in Natchez, or he could not have delivered them as stated.

Mr. Chief Justice SHARKEY delivered the opinion of the court.

The plaintiffs in error, Wood, Pentecost & Co., and Alonzo Wattles and Noah Barlow, were sued in a joint action as the makers and indorsers of a promissory note, by the defendants in error. They all joined in pleading the general issue. On the first trial, the case having been twice tried, Wood, Pentecost & Co., the makers, withdrew their plea and suffered a default, but the issue was tried as to the indorsers, and they had a verdict in their favor. A new trial was applied for by the plaintiffs below, which was granted, and resulted in a verdict in their favor, and the case is brought up by writ of error to reverse the judgment rendered on the second verdict.

In assigning errors, the counsel for the plaintiff in error embrace the proceedings had on both trials, and contend that the court erred in granting the new trial, for which error the judgment ought to be reversed, and judgment rendered for them on the first verdict, they having taken a bill of exceptions to the granting of the same, which embodies all the testimony and points made. The several errors assigned are in substance the following, to wit:

1. That the court below erred in permitting the plaintiffs below to introduce as evidence the notarial certificate or record of James K. Cook, certifying the protest of the note, and that notices were served on the indorsers.

2. That the court erred in setting aside the verdict and in granting a new trial.

3. That the court erred upon the second trial in overruling the objection to the note as evidence, and in allowing the notarial record to be read as evidence.

4. That the court erred in sustaining objections to questions asked of Connelly, a witness.

5. That the court erred on the second trial in refusing to allow the notarial record to be impeached. And,

6. That the court erred in refusing to give the instructions asked for by the counsel of Wattles and Barlow.

In taking a retrospect of the record, we are first naturally led to inquire into the regularity of the proceedings on the first trial; we may therefore take up the second error assigned, and investigate it first. This, indeed, necessarily embraces the first, the admissibility of the notarial record, which if it was an error at all, extends through both trials, as it was the only evidence offered to charge the indorsers.

The reasons assigned for a new trial are: 1. That the verdict was contrary to law and evidence. 2. That the court erred in permitting the notarial record of Cook to be impeached by proof of particular facts in no way connected with the case. And, 3. That the court erred in permitting the blank affidavits to be read in evidence. These reasons make it necessary that we should look into the testimony, and determine on the admissibility of that portion of it which is said to have been improperly admitted.

The plaintiffs' counsel read the note sued on, and then a notarial record contained in a volume of notarial records of protests, purporting to be a protest of the note sued on, in which the protest is set out at large, and at the bottom are two memoranda, stating when and how the notices were served: By one of them it appears that the notices were served on the 4th of November, and by the other that they were served on the 6th, (the 5th being Sunday.) Attached to this by wafers is the certificate of Cook, the notary, in which he states the foregoing to be a full, true and perfect record of his proceedings. Following this is the certificate of Louis Robetaille, a justice of the peace, certifying that Cook had made oath to the truth of the certificate. Then comes the impeaching testimony from the other side, the defendant's having objected to the introduction of this record generally.

Samuel Wood testified that these words in the notarial certificate, to wit, "at their store, Noah Barlow at his store," were in a hand writing different from that of the preceding part of the certificate, and were written with different ink and a different pen, the words quoted being in Cook's hand writing. He also stated that the certificate that the notices were served on the 4th of November, was all in Cook's hand writing. Louis Robetaille, the justice, stated that he was the justice before whom Cook made the affidavit which had been read. That Cook's general manner of

preparing the affidavits to be attached to his records or certificates, was to have sheets of them printed with suitable blanks, such as the one introduced shows, which were brought by Cook to the witness, he the witness afterwards signing his name and dating them at his leisure. That afterwards Cook and the witness went over the volumes of notarial records together, said Cook having previously at his leisure added his signature to the affidavits, but not in presence of the witness. The witness and Cook then compared the affidavits with the protests, and attached them to the leaf containing the protest by 'wafers, sometimes one wafering and sometimes the other, and after they had gone through the volume, in this way, the witness administered to Cook one general oath to the whole volume, or to so much of it as they had prepared, without reference to any particular case, and that Cook was not sworn to the affidavits otherwise than by this general oath; except in particular instances, where affidavits were wanting by particular persons, I suppose before the volume was ready for general use. Such affidavits, however, were not embraced in the book. These affidavits were sometimes in possession of Cook, and sometimes in possession of the witness. Several of these blank affidavits, signed by Cook and the witness, were exhibited to him, and he admitted that they were such as he had mentioned. These affidavits are also spread upon the record, being entirely ready for use, with the exception of a blank for the amount of the note and a blank for the description of the instrument, to be filled up with the words "bill of exchange" or "note," as the case might require.

Potter, sworn as a witness, stated that he handed the blank affidavits above mentioned to the counsel, to be used if deemed necessary; that they had been found by his partner at a previous term of the court, in the court house, either in a book of notarial records, or on the floor.

Aylett Buckner was next sworn, and stated that he held for collection a note for fifty thousand dollars, which had been protested by Cook, to whom he applied to know how Terry, an indorser, had been notified; and was informed that the notice was sent to Port Gibson, the notary having learned on inquiry that that was the proper post office. Witness stated to him that such a notice was insufficient, and whether he added that Rodney was the pro-

per place, he does not recollect, but Cook afterwards stated that he had also sent a notice to Rodney, and thereupon gave a certificate that he had so directed notices. The witness understood from him that these were the only notices which had been given. The witness afterwards learned that Fayette was Terry's post office, and informed Cook of this, and stated to him that he was liable for the amount of the note in consequence of his neglect; and Cook thereupon stated that he could furnish, or would testify to a notice to Fayette.

J. H. Van Hosen was also sworn, who stated that he had previously held a note which had been protested by Cook, to whom he applied two or three years after the protest, to learn the facts, deeming the protest defective. Cook proposed to alter the protest by inserting " the Planters' Bank of the state of Mississippi," instead of " the Bank at Natchez," and when objected to by witness, he stated that he thought he had a right to correct his records in any case.

As rebutting testimony, the plaintiffs offered several witnesses, who proved Cook's good character for truth and veracity, and the testimony closed, and on this evidence the jury found for defendants as before stated.

As regards this impeaching testimony, two questions present themselves under the reasons assigned for a new trial; 1. Was the notarial record liable to be impeached; and 2. If so, was it competent to impeach it by enquiring into or proving the particular facts disclosed in the testimony?

We cannot doubt but what the veracity of these notarial records may be attacked. The statute which makes them evidence does not profess to elevate them to the dignity of records, and they can be entitled to nó weight which they do not derive from the statute. The provision referred to is contained in the act of 1833, How. & Hutch. Digest, 609, sec. 33. The section begins by declaring that when it shall be necessary to have the evidence of a notary touching the protest of a note or bill, the official act of such notary, certified under his hand and official seal, shall be deemed conclusive evidence of the protest. This portion of the statute makes nothing conclusive but the mere protest. Then follows the provision which directs the notary to make a record of what has been

done, including the giving of notices and every other fact, and declares that when his record is so made, being certified under oath, " it shall have the same validity, force and effect in all courts of record within this state as if the said notary were personally present and interrogated in court." This is precisely the office of a deposition taken in the ordinary way. It is in no respect placed on higher ground. It is but a new mode of taking a deposition, founded in convenience. The statute gives it only such credit as the witness would be entitled to, if present. Being present, his testimony would be liable to impeachment. That a deposition may also be impeached is clear, and it may be done too by proving relevant facts, such as would be admissible if the witness were present. 2 Cowen and Hill's notes to Phillips' Evidence, 728, (note 509,) Id. 766; 6 Serg. & Rawle, 324; 5 Watts, 32.

In the next place, was it competent to discredit the notarial certificate by proof of particular facts? As a general rule, it is true that the veracity of a witness cannot be attacked by proof of particular acts. You cannot prove that he has been guilty of certain crimes; but this rule applies only to his general credit; when particular credit is concerned, particular inquiries are proper. 2 Cow. & Hill's notes to Phil. 764. The authors comment on and illustrate the distinction at some length, and fully show, by authority, that the distinction is tenable.

If you wish to destroy the general credibility of a witness, you cannot inquire into particular acts, but must prove generally that he is unworthy of credit. And there is a test by which to determine the propriety of the proof of particular facts. And to determine, say the authors, whether the inquiry would be proper, would the answer, in any possible shape, or in the slightest degree, affect any question of fact which can be raised in the cause; if it may, the inquiry is relevant. Ibid. 726, note 509. Tried by this test, the impeaching testimony was clearly proper. It is quite apparent that the object of defendants was to destroy the effect of Cook's record, and the necessary tendency of the evidence was to that point. It tended to show how all of his records of this particular kind were made out. The inference followed that this was also made out in that way. Indeed, the proof was next to positive that it was one of those described or spoken of. Robe-

taille stated that his volumes of records were made out in the way
he mentioned; that certificates and affidavits in particular cases,
furnished particular persons, were not included in the volumes.
This was in a volume, and it follows that it must have been certi-
fied and sworn to as the others were. The testimony, then, in
some shape, and to a considerable degree, affected the question of
fact then before the court. The object was to show a disregard of
duty, and by strong inference to apply such breach of duty to the
particular case. The cases given by the authors referred to will
clearly show that this testimony falls within the rule. The testi-
mony of Robetaille, the justice, who was the most material wit-
ness, might have rested on questionable ground, if it had been
objected to; but, on the first trial, no objection seems to have been
made to it; at least the bill of exceptions is silent on the subject;
and thus we must infer that there was no objection, and the objec-
tion was an after-thought. But, even on the motion for a new
trial, the objection was placed on the wrong foundation. I say
it might have stood on questionable ground, but still I incline to
think it would have been admissible, even if an objection had
been made at the proper time and on the proper ground. A jus-
tice of the peace probably could not be allowed to falsify his own
certificate, for this would be to show his own mal-conduct, and to
deny an accredited act; but when he is called to explain the man-
ner in which his certificate was given, the question is different.
The justice seems to have acted under a misconception as to the
legal effect of the act. He does not deny his certificate, or say
that it was falsely given, but he states the mode adopted, the ne-
cessary effect of which is to destroy its validity.

In the case Jackson *v.* Wyckoff, 1 J. R. 498, it was held com-
petent for a judge to state how he had given the certificate of the
proof of a deed, the necessary effect of which was to destroy the
validity of his certificate. But there was no objection to Robe-
taille, consequently his competency cannot now be questioned;
for, if it had been at the proper time, the difficulty might have
been removed by substituting other evidence of the same facts
testified to by him. I think it has been shown, then, that it was
competent for the defendants below to attack the notarial record,
and that it was also competent for them to have done so by proof

of the particular facts disclosed by the testimony, especially as no objection seems to have been made to any of the witnesses, except a general one to the relevancy of Buckner's testimony.    An objection, however, to *all* of the testimony, on the ground of *relevancy only*, would not have been well founded.    As a consequence, from what has been said, it follows that the court erred in supposing that illegal testimony had been admitted, on the first trial, to impeach the record.    Was the verdict contrary to law and evidence? In connection with this inquiry, it is proper that we should examine somewhat into the plaintiffs' evidence.

Cook's record was objected to generally, and such an objection made to the admissibility of a written instrument will reach every defect apparent on its face; objections *dehors* the instrument must be specified, or the court cannot know them.    It is insisted in argument, that Cook's certificate was inadmissible, because he was a citizen of the county.    This objection is undoubtedly a good one; but on a first view of the subject I was inclined to think that this also was an objection which should have been raised at the time it was admitted and specified particularly, as it might then have been removed by introducing Cook.    Further reflection has induced me to think that this view of the subject was incorrect.    This is written evidence, substituted for the presence of the witness in certain cases, but only in certain cases.    The law is not changed, where the notary resides in the county.    Depositions can never be used, unless it be shown that the witness is not within the jurisdiction of the court, or from other special cause is unable to attend.    " It is, says Starkie, an incontrovertible rule, that when the witness himself may be produced, his deposition cannot be read, for it is not the best evidence."    1 Starkie, 261.    In the application of this rule it is uniformly necessary for the party introducing a deposition, to lay a proper foundation by showing that the party is not within the jurisdiction of the court, or being within it, that diligence has been used to procure his attendance, Id. 264.    Now if a deposition has been read in the court below, without a specific objection on the ground mentioned, it would be a fair presumption that the proper foundation for its introduction had been laid, or that it had been waived.    But when it appears upon the face of the record, and indeed by the deposition itself, as it does

in this instance, then it may be regarded as a patent defect which is reached by a general objection to its admissibility. The law, for instance, has only allowed Cook's notarial record to be read out of the county of his residence; he shows by his protest that he is a resident officer in the county where the suit was tried. This is affirmatively showing the incompetency of his record in that county, and is reached by a general objection to its competency in that county. If it had been read without any objection, then of course we would not listen to such an objection as that mentioned, made for the first time in this court. Then the plaintiffs below made out their case by incompetent evidence, and this is an additional reason why the verdict should not have been set aside. Independent of the minor objections made to the certificate, it was incompetent; but even admitting that it had been competent, what was the effect of the testimony on the other side. It was to destroy its legal validity. If the jury believed that the certificate had been made out and sworn to in the manner mentioned by Robetaille, and they could not well have believed otherwise, then it was no better than blank paper; it was evidence of nothing. Not only then did the plaintiff fail to make competent proof to charge the defendants, but even their incompetent proof was successfully destroyed. In any legal aspect of the case, then, the verdict was right. Legally it could not have been different. Now as to the propriety of reversing the judgment rendered on the last verdict, and restoring the parties to their condition on the first verdict. At common law the granting or refusing a new trial was matter of discretion, of which error could not be assigned, but a new rule is introduced by statute. The act of 1830, How. & Hutch, Dig. 493, sec. 52, authorizes either party to except to the granting or refusing to grant a new trial, and it may be assigned as error that the judge improperly granted or refused a new trial. This must have been designed to operate mutually as well for the party against whom the new trial was granted, as for the party against whom it might be improperly refused. The remedy was designed to correct a mischief, or to prevent it, in granting new trials against verdicts obviously supported by law and evidence. The case before us comes within the very terms of the statute. Here was a verdict set aside, which was obviously right on the law and evidence,

Wood *et al. v.* The American Life Insurance and Trust Company.

and the party in whose favor it was rendered assigns the granting of the new trial as error.   His case is within the very letter and spirit of the statute, and we have no alternative but to sustain him. In general I should feel great reluctance in sustaining such an assignment of error for the defendant, or for either party, when on the second trial a verdict had been found for the opposite party, and perhaps such an application might with some propriety be refused, when the second verdict is found on the same evidence given on the first trial ; but in this instance it was not, and therefore I feel the less reluctance in reversing the judgment for this error. On the second trial, the plaintiffs relied on the evidence of Cook's record alone to charge the indorsers ; this we have said was improperly admitted.   The defendant's evidence was improperly ruled out, having shown, as we think, that it was competent.   The second verdict, then, is not sustained either by competent evidence or law, whilst the first is sustained by both.   We must therefore reverse the judgment, and reinstate the first verdict as having been erroneously set aside, and render judgment on that verdict for the plaintiffs in error, Wattles and Barlow, this being the judgment which the court below should have rendered.

These remarks cover the first, second and fifth errors assigned, and it becomes unnecessary to examine the others, as they present nothing which is sufficient to change the result.